IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>ISLAND VIEW CROSSING II, L.P.,<br><br>Debtor. | CHAPTER 11<br>Case No. 17-14454-ELF |
| KEVIN O'HALLORAN, in his capacity as Chapter 11 Trustee for Island View Crossing II, L.P.,<br><br>Plaintiff,<br><br>v.<br><br>PRUDENTIAL SAVINGS BANK,<br><br>Defendant. | Adv. No. _____ |

## COMPLAINT

Plaintiff, Kevin O'Halloran ("Trustee" or "Plaintiff"), in his capacity as Chapter 11 Trustee for Island View Crossing II, L.P. ("Debtor"), by and through the undersigned counsel, files this Complaint against Prudential Savings Bank ("Prudential" or "Defendant"), and in support thereof alleges the following:

**I.    INTRODUCTION**

1.     As more specifically described herein, the Debtor's principal, Renato J. Gualtieri ("Gualtieri"), engaged in a long-standing banking and lending relationship with Prudential dating back to 1994, for the purposes of funding various real estate development projects, owned by the Debtor and affiliated entities for which Gualtieri was principal. In 2011, Mr. Gualtieri acquired control of the Debtor, which owned the Island View Property (defined, *infra*). The Island View

1

Property comprised the Debtor's principal asset.

2. As more fully alleged, *infra*, after the acquisition of the Island View Property, Gualtieri and Prudential entered into loan and collateral mortgage agreements for the benefit of other entities and projects, securing these loans with mortgages on the Debtor's property with no or less than reasonably equivalent value paid or benefit given to the Debtor in exchange. Similarly, sums advanced on loans purportedly intended to fund development of the Island View Property, which the Debtor was obligated to repay and which formed the basis of an encumbrance on the Debtor's principal asset, were not advanced to the Debtor and were used for the benefit of other entities. All of the advances against and encumbrances on the Debtor's principal asset were made at a time when the Debtor was insolvent, unable to pay its own debts as they came due, and inadequately capitalized for the business in which it was engaged.

3. Prudential knowingly facilitated these encumbrances upon and transfers away from the insolvent Debtor, and as such these transactions and/or the values thereof are avoidable and recoverable. Furthermore, the wrongful acts of Prudential caused harm to the other creditors of the Debtor and gave Prudential an unfair advantage over those other creditors. As such, any and all claims of Prudential against the Debtor should be equitably subordinated below the rights of all other creditors of the Debtor.

**II.    JURISDICTION AND VENUE**

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

5. The Trustee consents to the entry of final orders or judgment by this Court in connection with all claims asserted herein.

6. Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III. PARTIES

### A. The Plaintiff

7. On June 30, 2017 (the "Petition Date"), Island View Crossing II, L.P. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Pennsylvania under the caption *In re Island View Crossing II, L.P.*, U.S.B.C. E.D. Pa., Case No. 17-14454-ELF.

8. Plaintiff Kevin O'Halloran is the duly appointed Chapter 11 Trustee of the Debtor's bankruptcy estate.

9. The Debtor is a Pennsylvania limited partnership with its principal place of business located at 1600 Radcliffe Street, Bristol Borough, PA 19007. Its general partner is Island View Properties, Inc., a Pennsylvania corporation.

### B. The Defendant

10. Defendant Prudential Savings Bank is a Pennsylvania chartered savings bank with its principal place of business located at 3993 Huntington Pike, Suite 300, Huntington Valley, PA 19006.

## IV. FACTS

11. Beginning in 1989, the Debtor's principal – Renato J. Gualtieri – and various entities with which he is affiliated began developing residential real estate.

12. Those entities include:

   a. the Debtor, which at the time of the bankruptcy filing was developing a 169 unit townhouse and condominium complex (the "Island View Project" or the "Project") located directly on the Delaware River at 1600 Radcliffe Street in Bristol Borough,

3

Bucks County, Pennsylvania (the "Island View Property" or the "Property");

b. Steeple Run, L.P., which was developing 21 acres of land in Richland, Bucks County, Pennsylvania (the "Steeple Run Project");

c. Calnshire Estates, LLC, which was developing single family houses consisting of 26 remaining lots in West Caln Township, Chester County, Pennsylvania (the "Calnshire Project"); and

d. Durham Manor, LLC, which was completing the development of single family houses on a tract of land in Middletown Township, Bucks County, Pennsylvania (the "Durham Manor Project").

A. **The Island View Project**

13. In 2011, Gualtieri was presented with an opportunity to acquire the Debtor and its principal asset, the Island View Property – a 17.5-acre, former World War I shipbuilding facility on the Delaware River – at a price that he believed was far below market value for purposes of developing residential real estate and thereby increasing the value of the property significantly.

14. While Gualtieri purchased the Debtor at a price below its fair market value, the Island View Property needed substantial site work before vertical construction could begin.

15. Indeed, as a result of the historical uses of the Project as a World War I shipbuilding facility, the Island View Project had significant industrial issues that would need to be remediated, including: (i) removal of enormous amounts of concrete and steel that were the foundation of the former shipbuilding facility and its surrounding parking lots; (ii) removal of underground tanks; (iii) supply of vast amounts of clean fill; and (iv) re-grading the entire Project.

16. However, after acquiring the Debtor, efforts were focused on the Steeple Run, Calnshire, and Durham Manor Projects, often at the expense of the Debtor.

4

B. **Prudential Demands, And the Debtor Provides, a "Collateral Mortgage" on the Island View Property, Encumbering Its Primary Asset Without Receiving Reasonably Equivalent Value In Return**

17. Prudential and the Debtor entered into a "collateral mortgage" dated September 20, 2011 concerning the Steeple Run Project (the "Steeple Run Collateral Mortgage"), a true and correct copy is attached hereto as Exhibit A.

18. The Steeple Run Collateral Mortgage was recorded with the Bucks County Recorder of Deeds on October 19, 2011 under Instrument No. 2011070888. *See* Ex. A, p. 1.

19. The Steeple Run Collateral Mortgage states that:

> on November 20, 2008 Mortgagee [i.e., Prudential] made a Three Million Nine Hundred Eleven Thousand Two Hundred Fifty ($3,911,250.00) Dollar loan to Steeple Run, L.P. . . . to acquire a certain 21.1289 acre tract of land . . . evidenced by a certain Land Acquisition Loan Agreement between [Steeple Run, L.P. and Prudential] and the Note and Mortgage of [Steeple Run, L.P.] and other documents (the '[Steeple Run] Loan Documents')."

*Id.* at p. 3

20. The Steeple Run Collateral Mortgage further states that "an Addendum to the [Steeple Run] Loan Agreement requires Mortgagor herein [i.e., the Debtor] to give a Mortgage on [the Island View Property] as additional collateral security for the loan to Borrower." *Id.*

21. The Steeple Run Collateral Mortgage purports to give Prudential a mortgage on the Island View Property, and states that any default under the Steeple Run Loan Agreement entitles Prudential to foreclose on the Debtor's primary asset to collect "the entire principal amount of this Mortgage [i.e., $3,911,250.00] or at the option of [Prudential] so much thereof as shall be necessary to cure the said default by [Steeple Run, L.P.] . . . together with an attorney's commission of five (5%) percent of the original principal sum or the amount of the default." *Id.* at p. 4-5.

22. The only consideration purportedly provided by Prudential to the Debtor in

5

exchange for the Steeple Run Collateral Mortgage was "One ($1.00) Dollar in hand received." *Id.* at p. 3.

23. Both the plain language of the Steeple Run Collateral Mortgage and internal Prudential documents establish that Prudential knew that the Steeple Run Collateral Mortgage was encumbering the Debtor's property without providing reasonably equivalent value to the Debtor.

24. The Debtor received no consideration for entering into the Steeple Run Collateral Mortgage, which was made at a time when the Debtor was insolvent (or rendered insolvent as a result of entering into this mortgage), unable to pay its debts as they came due, and inadequately capitalized for the business in which it was engaged.

**C.    Prudential Loans Money to the Debtor Which Is Used to Reduce the Loan Balances Owed by Other Entities, Burdening the Debtor Without Providing Reasonably Equivalent Value In Return**

25. Prudential and the Debtor entered into a Loan Agreement dated September 20, 2013 (the "September 2013 Loan Agreement"), a true and correct copy is attached hereto as Exhibit B.

26. The September 2013 Loan Agreement states that the Debtor is borrowing $1,400,000.00 from Prudential (the "September 2013 Loan") "to be used to reduce the balance due on a certain loan from the Bank to Durham Manor, LLC . . . andfor [sic] payment of costs and expenses associated with the loan closing." *See* Ex. B, at p. 1.

27. In connection with the September 2013 Loan Agreement, the Debtor and Prudential entered into a $1,400,000.00 Mortgage and Security Agreement dated September 20, 2013 (the "IVC-Durham Mortgage"), which further encumbered the Island View Property.

28. The IVC-Durham Mortgage was recorded with the Bucks County Recorder of Deeds on September 27, 2013 under instrument number 2013080879. A true and correct copy of the recorded IVC-Durham Mortgage is attached hereto as Exhibit C.

6

29. Investigation conducted by the Trustee has revealed that only $280,829.84 of the advances made by Prudential under the $1.4 million September 2013 Loan were made for the benefit of the Debtor.

30. Beyond this $280,829.84, the Debtor received no consideration for the $1,400,000.00 encumbrance of its principal asset, which encumbrance was made at a time when the Debtor was insolvent (or rendered insolvent as a result of entering into this mortgage), unable to pay its debts as they came due, and inadequately capitalized for the business in which it was engaged.

31. Not only was the Debtor's asset encumbered, but the funds intended to benefit the Debtor were transferred elsewhere, thus impeding prospects for profitable development.

D. **The Calnshire Manor "Collateral Mortgage" Further Encumbered the Property, Without Providing Reasonably Equivalent Value In Return**

32. Prudential and the Debtor entered into a "Collateral Mortgage" dated May 30, 2014 concerning the Calnshire Project (the "Calnshire Collateral Mortgage"), a true and correct copy is attached hereto as Exhibit D.

33. The Calnshire Collateral Mortgage was recorded with the Bucks County Recorder of Deeds on July 23, 2014 under instrument number 2014038527. *See* Ex. D, at p. 1.

34. The Calnshire Collateral Mortgage states that "Mortgagee [i.e., Prudential] has made a Five Million One Hundred Thirty Six Thousand ($5,136,000.00) Dollar loan to Durham Manor, LLC . . . to construct sixteen (16) single family houses on a tract of land in Middletown Township, Bucks County, Pennsylvania . . . evidenced by a certain Development Construction Loan Agreement (the '[Durham Manor] Loan Agreement') between [Durham Manor, LLC] and [Prudential]." *Id.* at p. 3.

35. The Calnshire Collateral Mortgage further states that the "[Durham Manor] Loan

7

Agreement required [Durham Manor, LLC] to provide a Collateral Mortgage on premises situate and known as 476-80, 486 and 490 West Street Road, Warminster, Bucks County, PA (the 'Street Road Properties') . . . and . . . [Durham Manor, LLC] has requested that the Street Road Properties be released from the lien of the Collateral Mortgage and that this [Calnshire] Collateral Mortgage given by [the Debtor] to [Prudential] but substituted in replacement." *Id.*

36. The Calnshire Collateral Mortgage purports to give Prudential a mortgage on the Island View Property, the Debtor's primary asset, and states that any default under the Durham Manor Loan Agreement entitles Prudential to foreclose on the Debtor's primary asset to collect "the entire principal amount of this Mortgage [i.e., $5,136,000.00] or at the option of [Prudential] so much thereof as shall be necessary to cure the said default by [Durham Manor, LLC] . . . together with an attorney's commission of five (5%) percent of the original principal sum or the amount of the default." *Id.* at p. 4.

37. The only consideration purportedly provided by Prudential to the Debtor in exchange for the Calnshire Collateral Mortgage is "One ($1.00) Dollar in hand received." *Id.* at p. 3.

38. Both the plain language of the Calnshire Collateral Mortgage and internal Prudential documents establish that Prudential knew that the Calnshire Collateral Mortgage was encumbering the Debtor's property without providing reasonably equivalent value to the Debtor.

39. The Debtor received no consideration for entering into the Calnshire Collateral Mortgage, which was made at a time when the Debtor was insolvent (or rendered insolvent as a result of entering into this mortgage), unable to pay its debts as they came due, and inadequately capitalized for the business in which it was engaged.

E.  **Value of Money Loaned Under the November 2014 Island View Construction Loan is Destroyed After Prudential's Misconduct Destroys the Project**

40. In late 2014, the Debtor approached Prudential about providing a construction loan for the development and construction of the Island View Project, sharing with Prudential comprehensive and confidential data and projections concerning its plans for the Project.

41. The Debtor negotiated the new construction loan with Salvatore Fratanduono, Prudential's Senior Vice President and Chief Credit Officer, and Thomas Vento, Prudential's President, Chief Executive Officer, and Chairman of the Board.

42. On November 26, 2014, the Debtor and Prudential reached an agreement on a new $5,541,468 construction loan for the Island View Project, and the terms of that agreement were embodied in a series of documents prepared on behalf of Prudential by and through its counsel and board member, Jerome Balka, Esquire.

43. Such documents included, among others, a $5,541,468 promissory note (the "November 2014 Note"), a Development Construction Loan Agreement (the "November 2014 Loan Agreement"), a mortgage on the Project which was recorded with the Bucks County Recorder of Deeds on January 7, 2015 under instrument number 2015001098 (the "November 2014 Mortgage"). True and correct copies of the November 2014 Note, the November 2014 Loan Agreement, and the November 2014 Mortgage are attached to this complaint and incorporated herein as Exhibits E, F, and G, respectively.

44. While ostensibly intended to fund construction of the Island View Project, Section 1.5 of the November 2014 Loan Agreement specifically requires that proceeds from the sale of specified Island View townhouses and condominiums by the Debtor be used to repay other loans not made to the Debtor, including the loans made to Durham Manor and Steeple Run. *See* Ex. F, at p. 4.

F. **With the Island View Project Having Been Destroyed By Prudential's Wrongful Conduct, the Debtor Files for Bankruptcy**

45. Due to the misconduct of Prudential – which is outlined in detail in the Complaint filed on March 31, 2016 in the Court of Common Pleas of Philadelphia County, which was removed to this Court on July 18, 2017, and assigned Adversary Number 17-00202 (ELF) (the "Lender Liability Adversary Complaint") – the Project was destroyed and the Debtor was forced to file for bankruptcy on June 30, 2017.

46. In addition to the wrongful and harmful conduct of Prudential which drove the Debtor into bankruptcy, the uncompensated encumbrances on and transfers away from the Debtor's principal asset damaged the Debtor's business, and damaged the unsecured creditors of the Debtor.

## FIRST CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
**Pursuant to 12 Pa.C.S. §§ 5104(a)(2) & 5105, and 11 U.S.C. §§ 544 & 550**

47. Paragraphs 1-46 of this Complaint are incorporated herein by reference, as if restated in their entirety.

48. As set forth in detail above, the Trustee seeks to avoid as fraudulent transfers (collectively, the "Fraudulent Transfers"), the following:

   a. the Steeple Run Collateral Mortgage, which was executed on September 20, 2011, and which has encumbered the Debtor's ownership of the Island View Property without providing a corresponding benefit;

   b. at least $1,119,170.16 of the funds disbursed pursuant to the September 2013 Loan Agreement, which the Debtor is purportedly obligated to repay but from which the Debtor received no benefit;

   c. the associated IVC-Durham Mortgage, which has encumbered the Debtor's

ownership of the Island View Property without providing a corresponding benefit;

    d. the Calnshire Collateral Mortgage, which was executed on May 30, 2014, and which has encumbered the Debtor's ownership of the Island View Property without providing a corresponding benefit;

    e. the November 2014 Loan Agreement and November 2014 Note, because, as the wrongdoing alleged in the Lender Liability Adversary Complaint outlines, Prudential's misconduct resulted in the destruction of the Project, thereby destroying the value of all funds advanced; and

    f. the associated November 2014 Mortgage, which has encumbered the Debtor's ownership of the Island View Property without providing a corresponding benefit.

49.    Each Fraudulent Transfer was a "transfer" within the definition of 12 Pa.C.S. § 5101.

50.    The Fraudulent Transfers were made at a time when the Debtor had debts greater than the sum of its assets, rendering it insolvent within the definition of 12 Pa.C.S. § 5102.

51.    As more particularly set forth above, the Debtor received no or less than reasonably equivalent value, in exchange for each of the Fraudulent Transfers.

52.    The Fraudulent Transfers were made at a time when the Debtor was insolvent (or rendered insolvent as a result of the Fraudulent Transfers), had unreasonably small capital for the business in which it was engaged, and/or had incurred (or intended to incur) debts beyond its ability to pay as such debts matured.

53.    "Under 11 U.S.C. § 544(b), the Trustee may use the statute of limitations available to any actual creditor of the debtor as of the commencement of the case." *In re Polichuk*, 506 B.R. 405, 419 (Bankr. E.D. Pa. 2014).

54. On August 2, 2017, the Internal Revenue Service filed a $19,935.79 Proof of Claim (No. 6-1) reflecting that the Debtor was assessed sums due in association with:

   a. its partnership taxes for the tax years ending December 31, 2011, December 31, 2012, December 31, 2013, December 31, 2014; and

   b. For the tax years ending December 31, 2015 and December 31, 2016, in which it failed to file tax returns.

55. The Debtor did not pay any of the sums due to the IRS, and thus the IRS was a creditor of the Debtor at the time the bankruptcy case was filed.

56. The IRS has at least a ten-year lookback period for state law fraudulent transfer claims, *see* 26 U.S.C. §§ 6501, 6502, and its rights supersede any statute of limitations under state law. *See, e.g., U.S. v. Summerlin*, 310 U.S. 414, 416 (1940).

57. All of the Fraudulent Transfers asserted herein occurred within the applicable ten-year lookback period.

58. Accordingly, the Fraudulent Transfers constitute voidable fraudulent transfers pursuant to 11 U.S.C. § 544 and 12 Pa.C.S. § 5104 and/or 5105.

59. Prudential was the initial transferee of the Fraudulent Transfers and/or the entity for whose benefit the Fraudulent Transfers were made.

60. Accordingly, the Trustee is entitled to recover the transfers or their value from Prudential pursuant to 11 U.S.C. § 550(a).

### SECOND CLAIM – EQUITABLE SUBORDINATION
### Pursuant to 11 U.S.C. § 510

61. Paragraphs 1-60 of this Complaint are incorporated herein by reference, as if restated in their entirety.

62. For equitable subordination pursuant to 11 U.S.C. § 510(c), the Third Circuit

requires a showing that "(1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the bankruptcy code." *In re Covenant Partners, L.P.*, 531 B.R. 84, 99 (Bankr. E.D. Pa. 2015) (*quoting Citicorp Venture Capital Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986–987 (3d Cir.1998)).

63. The inequitable conduct engaged in by Prudential is set forth in detail in the Lender Liability Adversary Complaint, and the allegations in the Lender Liability Adversary Complaint are re-alleged and incorporated herein by reference, as if restated in their entirety.

64. In summary, the allegations in the Lender Liability Adversary Complaint detailing Prudential's inequitable conduct include, but are not limited to:

   a. Coercing and attempting to force the Debtor to accept drastic changes to existing loan agreements;

   b. Delaying and refusing to advance funds as required under loan agreements with the Debtor;

   c. Refusing to release funds escrowed for site improvements;

   d. Intentionally inducing the Debtor to enter into loan agreements with fraudulent, reckless, and/or negligent misrepresentations;

   e. Refusing to honor its unconditional commitment to refinance or purchase the Lava Loan (defined and outlined in detail in the Lender Liability Adversary Complaint);

   f. Threatening to foreclose on the Project and other collateral without any default existing or being declared;

   g. Manufacturing a sham default against the Debtor and affiliated entities;

  h. After the declaration of the sham default, attempting to control allocation of payment, including timing and amount, to subcontractors and suppliers;

  i. Attempting to force the Debtor and Gualtieri's affiliated entities to sell real estate for millions of dollars less than the appraised value reflected in appraisals obtained by Prudential itself; and

  j. Intentionally refusing to fund the Project such that it materially interfered with the Debtor's contractual relations with third parties, including but not limited to, subcontractors, suppliers and purchasers of residential properties.

  65. As a result of the wrongdoing of Prudential, as aforesaid here, and alleged in detail in the Lender Liability Adversary Complaint, all creditors of the Debtor have been injured and Prudential has obtained an unfair advantage over those other creditors.

  66. In the Release of Liens Agreement, approved by the Court on September 12, 2018 (Final Order, Docket No. 352), Prudential agreed to subordinate the Steeple Run Collateral Mortgage, the Calnshire Collateral Mortgage, the IVC-Durham Mortgage, and the November 2014 Mortgage to some, but not all, of the Debtor's creditors. *See* Release of Liens Agreement, Docket No. 341, Ex. D at p. 5-6.

  67. Given the willful, unfair, and bad faith inequitable conduct of Prudential, equitable subordination for <u>all</u> claims and to <u>all</u> creditors is consistent with provisions of the Bankruptcy Code.

  68. As such, any and all claims of Prudential – including claims heretofore or hereafter filed – against the Debtor should be equitably subordinated below the rights of all other creditors of the Debtor, pursuant to 11 U.S.C § 510 of the Bankruptcy Code.

**VI.    RELIEF REQUESTED**

WHEREFORE, Plaintiff Kevin O'Halloran, Chapter 11 Trustee for the estate of Island View Crossing II, L.P., demands judgment in his favor and against the Defendant:

(a) For avoidance and recovery of the Fraudulent Transfers, or the value thereof in the amounts set forth above;

(b) Directing Defendant to immediately pay the Trustee the amount of the Transfers, plus interest thereon and costs;

(c) Equitable subordination of any and claims of Defendant against the Debtor below the rights of all other creditors of the Debtor.

(d) Pre-Judgment and Post-Judgment Interest, reasonable attorneys' fees, and costs; and

(e) Such additional relief as this Court deems just.

Dated: December 3, 2018

_____
STEVEN M. COREN
KATHERINE L. PERKINS
KAUFMAN, COREN & RESS, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
Fax: (215) 735-5170
scoren@kcr-law.com
kperkins@kcr-law.com

*Counsel for Plaintiff*
*Kevin O'Halloran, Chapter 11 Trustee*